Good morning, Mr. Harwood. Good morning. May it please the Court, I am Bernard Harwood, and I'm here representing two of the appellates. They are Judge Hage, sitting far into the front bench, and then Judge Westry, who is now the presiding judge of the Montgomery Municipal Court. This Court made clear in Dykes v. Hausman a en banc decision that under the teaching of the Supreme Court's decision of Stump v. Sparkman, a judge's motivation to undertake a judicial act is irrelevant to any proper analysis of judicial immunity. And as in the present case, the plaintiffs in Dykes sought to circumvent judicial immunity by pleading around it, claiming that what they were really arguing about is that the defendant judge had conspired with others to come up with an agreement in advance of the judicial acts he undertook, and they argued that that prior conspiratorial agreement was the non-judicial act, and therefore were not subject to the protection of judicial immunity. In the present case, the plaintiffs cite to various judicial acts by Judge Hage, but then they attempt to avoid judicial immunity by alleging at various points in the complaint, they sprinkle throughout the complaint, sort of as a talismanic phrase, that these were all the product of policies, customs, practices. And in fact, they allege that Judge Hage had in essence conspired with the city of Montgomery, its mayor, its chief of police, the former chief of police, and judicial correction services to, quote, develop, adopt, ratify, and administer for the improper purpose of generating revenue various practices and policies in the municipal court. Six years after that... So what are the actual things the judge does that are the focus of the complaint? It seemed to me that there was a focus on probation order, the absence of hearings on indigency or considering alternatives to imprisonment, advising indigent defendants of their rights, and imprisoning the defendants for failure to pay. All of which seemed to me, at least, to be judicial acts. We agree, Judge Pryor, and they all apparently took place within the courtroom, within the confines of the courtroom. They were quintessential acts that a judge does. So your argument is that the only thing they really allege other than that is this alleged conspiracy? They rely on it as sort of an overarching, you might say, a forensic alchemy. If we ignore these acts that we've placed in the complaint, which obviously had an effect on the district judge, he was justifiably affronted by these list of horribles that they ascribed to what happened in specific cases with specific plaintiffs. But you, I mean, Judge Hayes, as presiding judge, did have administrative duties. He did have administrative duties, and of course, we recognize that, for example, in the one case where the court held that, well, if you demote and then fire a probation officer, that seems to us to be an administrative act. So we recognize there can be that dichotomy. We are simply saying that in this case, everything they referenced and cited to was, in fact, a judicial act related to sentencing, probation, commutation of sentence. And as the Supreme Court said in Morales v. Waco six years after the Dykes case, that if judicial immunity means anything, it means that a judge will not be deprived of immunity because the action he took was in error, was in excess of his authority. A judicial act does not become less judicial by virtue of an allegation of malice or corrupt motive. And in this case, after reciting a series of mistreatments of plaintiffs that naturally would get any judge's attention, the plaintiffs say, well, but wait a minute, forget all that. What we're really looking at is some prior agreement or conspiracy among these various parties. And I would say naturally affronted by that, what the district judge did, and I believe this is where respectfully he was led into error. He ruled this, quoting from his memorandum opinion. In this case, plaintiffs alleged that the city and Judge Hayes created a series of policies to increase municipal revenue through stops, ticketing and arrests. These are systemic and related policies, practices and customs. They note these policies resulted in million dollars of fines and forfeitures and note that Montgomery raised more than three times as much fines as did Huntsville. He then continues, and this is where I respectfully submit, he conflated motivation with functionality of the act. He states, as his analysis, given that municipal revenue generation, i.e. the motive, given that municipal revenue generation is not a function normally performed by a judge, these allegations are thus for nonjudicial actions. So there's been this conversation. May I, so just to follow up on that, it looked like to me that one of the allegations was that Judge Hayes adopted a practice of ticketing each violation separately so that the charges would be greater. And, you know, that that is not addressed to one case. That is a policy. I mean, accepting that the allegation for the truth, that is a policy as opposed to an action in an individual case, is it not? Well, actually, under Alabama law, each separate ticket has to be set up as a separate case. So this is a function of the underlying Alabama law. And what is the citation to that? Judge, I had it in the brief. I don't call it to mind at this moment. You'll have some rebuttal time. You might be able to find the time for that citation. I see the red light. I won't. Yeah, well, I was going to ask, though, at the end of the day, though, whether that's the policy or not, you still have to end up doing that in each case, right? If a policy was put in a desk drawer and never acted upon, it would be like the tree that falls in the woods. And the acting upon it is a judicial act. Until there's an act upon it, there hasn't been any affronting of anybody's constitutional rights. Thank you. Ms. Holliday. May it please the court, I represent Mayor Todd Strange and police chiefs Murphy and Finley. They remain individually in connection with the statutory claims. Count seven, the anti-peonage claim and the state law claim for false imprisonment. Count twelve, as a housekeeping matter, the plaintiffs have dropped the chiefs from count twelve as evidenced by their brief. Similarly, the plaintiffs have declined to argue two of the statutory positions stated in count twelve. That's 18 U.S.C. 1581 and 1593A. They argue only 1589. So just so I'm sure I'm with you. So we do not need to consider the false imprisonment claims against your clients. That's out of the case. Only as to Mayor Strange. I'm sorry. Yeah, the police chiefs. All right. Got it. Thank you. That's what that's what's argued. What remains is the claim for false for forced labor based on voluntary work opportunities given at the jail and a claim for false imprisonment. And again, the latter claim is just against Mayor Strange. The appellee's brief make it clear that both claims are based on a single alleged wrong. And the wrong is these inadequate hearings. There were hearings. They claim they were inadequate, held before the plaintiff's fines and costs were converted to jail time. And they acknowledge in their brief, in their complaint and their brief, paragraph 270 of the complaint that 151862 of Alabama Code permits conversion of fines and costs to jail time. Rule 26.11, they mentioned also in their brief and in paragraph 270 of their complaint, permit this conversion. Their claim is that the hearings were inadequate. It's very clear. What I find really missing here is anything that ties either the police chief or mayor to anything involving the day to day work of the municipal court. That's right. And that's that's the gist of the argument that we are making today. Looks a lot like the Iqbal case to me on a municipal level. Right. It's an Iqbal case on the municipal level. And also the Twombly case incredibly is also absolutely parallel in that a scheme is alleged in Twombly, an agreement. But just because there's some facts that might be consistent with the existence of that agreement does not make the agreement. Iqbal particularly, though, seemed to me to be more relevant in that it's a higher ranking government official who's alleged to have been, you know, in charge of whatever is going on. And you've got to the Supreme Court has told us that you've got to say more than that. You've got to strip away the conclusory assertions and get to what the actual facts are. It does not appear to me that the district court did that. Let me just turn you to. So as I understand the argument on the anti-peonage, you know, the allegation is as to the police chiefs. The argument is they were the, you know, the statute vests them with authority to supervise the jail. People were allowed or required to work off their fines by washing police cars and cleaning up the jail and cleaning up the courtroom. So, I mean, that seems like an allegation that they violated the anti-peonage law. Why is that not sufficient? It's not sufficient because they even recognize in their complaint and I can and in their briefing, that is, that what makes this an anti-peonage problem, even in their view, is that the sentences themselves were unlawful. We say in our briefs that there are good time credits given in connection with work done in prison every day in this country, including in the federal courts. But, I mean, I think the allegation is, as I understood it, was you get twenty five dollars more a day off of your fine if you work. That's the violation. That's that. But it doesn't make a violation because you knowingly have to, by means of a threat of jail time. The jailers were not, first of all, we don't know that the police chiefs even knew that this was going on. So that makes it, they knew that they knew the inmates were washing the cars. They don't know that people are given credit for watching the cars. There's no allegation that they know of the specific, you know, communications between the jail and the court and what the court was doing in connection with sentencing with respect to information about voluntary work programs. So the fact that you can see an inmate doing work does not mean that it's anything more than a work release program. It doesn't mean that you know that there's, first of all, that they're in there unlawfully, which is really what the gist of their claim is. But secondly, you don't know, you know, the police chief doesn't have a town this size and not knowing the specifics of what's happening, what's being communicated to that jail, from that jail or to the court and what the court's doing with that information. And so to the extent that there was any reduction, it is the court that's making the reduction, it's not the jailer. The jailer is given the opportunity. The jailers, to the extent, and also you have to look at the statute. Does the jailer have the responsibility to keep up with who served their time and who hasn't served their time? The jailer does to some extent, but the court actually, in this instance, is not in the facts, but the court in this instance issues the order to release. Well, but the allegation is that the amount of time somebody has to serve is based on how many days they work. And so that would be part of the calculation on how long a sentence is served, right? That would be. That would be a part of the calculation. There's a jailer involved. The jailer has got to give some communication to the court. We, we, we do think that you can infer that from the pleadings and from the allegations, but that doesn't mean the police chief's involved. And it also doesn't mean that what the jailer's done, even if you could impute supervisory liability, which we say you cannot under Iqbal or under any statute argument they've made, the jailer himself has to coerce by means of a threat of a jail sentence, by means of additional punishment. And if you look at the Minicol case and there's a brand new case along the same lines under 1589, the problem becomes if you have work and because you do not do the work in the jail, you are confined to solitary confinement, you get additional days. The Peterson case, for instance, makes the point very well. If the jailer, the sheriff in that case, is actually in providing, I'm sorry, I didn't answer your question, but I mean, you've got some time for a rebuttal. If the jailer's providing a benefit, that is not a coercion under 1589. In other words, providing a benefit, is that what you said? Right. If the jailer's providing an opportunity to be released early. OK, Ms. Holliday, you've saved two minutes for a rebuttal. Ms. Morgan. May it please the court, I'm Martha Morgan and with me are co-counsel Hank Sanders and Attorney Fire, Fire Rose Turay. I know it's been a long week and I'll try not to unduly prolong it. But it's our last day. So we're always we're always feeling good about that. OK, because I do have some things and I'm sure you will have some questions, so. It's hard to believe that we're here in the Middle District of Alabama, more than 115 years after Judge Thomas Goode Jones delivered his grand jury charge in the that their jail program was really just a voluntary community service program and that Judge Hayes should be immune from his administrative policies that allowed that program to operate by agreeing that jailers could credit $25 a day. To the $50 a day that our clients were being credited for sitting in Montgomery's debtors prison, for example, while Angela McCullough was sitting out her debt. What concerns me about this case, Ms. Morgan, is not I mean, they're disturbing allegations in the complaint. But the question for me is whether there's judicial immunity and whether, as to Mayor Strange and the police chief, your complaint satisfies Iqbal, Twombly and Iqbal particularly. It appears to me that on the judicial side, that everything that the probation orders, whether or not, you know, he advises about counsel, all those kinds of matters, the ones that I laid out earlier, are judicial acts. OK, yeah. Let me address the judicial immunity arguments. First of all, the and the Iqbal related arguments, the only count, the only counts left in this appeal, this court has dismissed all official capacity claim, entity immunities are left. And so I don't know, Judge Westry, why he's even here arguing. My understanding is he now has been substituted for the official capacity claim against the presiding judge, which the lower court has not even determined yet whether in his official capacity, which is the equivalent of suing the entity, not the individual, whether the presiding judge of the Montgomery Municipal Court is a municipal official or a state official. If he's a municipal official, really, whether he has any judicial, even if his found to be a municipal. Municipal, municipal judges are members of the Alabama Unified Judicial System. They are. They are. And they also act in administrative capacities for their municipalities. Yeah, the thing I'm worried about is, is whether the things that are the subject of the complaint are judicial acts. Well, the only things that are the subject to the complaint that are really before you today in the federal claims are count, is count seven. And we think there's clearly sufficient factual allegations concerning the policies around the forced debtors prison. And we think it's clearly different from any case they've cited. None of them have dealt with peonage programs within jails. And that's the crux of our argument. This violates peonage law because they're working under threat of prolonged both physical and legal coercion. And that's peonage. And we haven't abandoned any peonage claims. Judge Hayes didn't even mention any in his initial brief, didn't cite any statutes. The city's defendant so-called cited all four, but then only talked about 1589. So if there's any confusion in our reply brief, it shouldn't be said that we've abandoned our peonage claims along with our forced labor claims. We're not the appellants in this case. If there's any abandoning, they've done it. And it also was done to avoid serious harm to them and their families. Ms. McCullough, who had done the dangerous work with the suicide woman, had slit her wrist. Her young son had to be institutionalized while she was serving this time because they weren't even allowed to see. He had mental disabilities, but they weren't allowed. One woman, Johnson, Ms. Markita Johnson, stayed nine months and did their labor, washed cars, cooked, cleaned. I mean, Ms. Morgan. Yes, I'm sorry. Could I force, could I focus you a moment on what it is that the complaint alleges that the judge does to further the scheme? Because it seems to me what the complaint is talking about is that the probation orders and the terms of those orders, the whether hearing meaningful hearings on consideration of alternatives to imprisonment were provided, whether it was a provision for adequate counsel, and then whether the defendants are in prison for failure to pay their debts. All of those appear to me, those appear to be what the gist of this complaint and all of those appear to me to be judicial acts. None of, Judge Hayes has not, there's no individual capacity claims against him in any of the 1983 actions related to all the things you've just mentioned. The only individual capacity claims against Judge Hayes are for his acts and labor claims. There are no individual capacity claims against the judge. So all the argument about he should get immunity for those things are just to make it look, I guess, like we didn't know what we're doing when we drafted our complaints and made our further decisions about which claims to pursue. But I think we really do have to focus on the peonage claims and to the extent that any of the other claims are relevant under an Iqbal type analysis, I would point you to a recent, very clear decision from the federal circuit in Lifetime Industries versus Trimlock that talks about how when you're doing the analysis that you have to look at all the allegations taken together. They say we don't say that these inferences are in fact correct or that they're the only fair inferences to be drawn, but taken together and at a point like us where we have been given no discovery. It's been three years. We have no discovery to support, further support the allegations that we have in good faith made of how we believe. And our clients have said this program operated and the weeks short we believe we have. The problem I have with that, so they've raised the defense that's a defense of absolute immunity. It's not qualified immunity. Yeah, that's the one I've tried to get some focus on. And that means you don't get discovery if they're entitled to it. And what the district judge said about that was that municipal revenue generation is not a function normally performed by a judge, right? And so we don't really have much in the district court's order, right? I'm trying to understand the basis for his reasoning. And then when I look at the complaint to see what it is that supports the notion that what the judge is doing is furthering municipal revenue generation. It's all the things that I just listed earlier, all of which to me, it appears to me are judicial acts. And if they are judicial acts, as I understand the law, a judge enjoys absolute immunity. I would agree with you on that. But I don't think for the count seven claims that are left, I believe, I contend he would It is being done, well, under the benefiting clause, I guess, the fact that revenue is being generated. But we argue that in addition to our claims that in general, his policies under other claims were administrative and fiscal, that these claims, I think, would be administrative apart from the question of whether they were designed to raise revenue. And I would point you to the, we submitted some supplemental letter briefs and the New York Times, Kaiser, Kisner, they said it was a very similar, except here, the difference is, I think, even greater in Kisner, there was, as far as I can tell, only one judge. There wasn't a presiding judge setting policy for all the judges on the court. But they concluded that even at the summary judgment stage, they couldn't grant judicial immunity to him because it seemed like most or much of what he was doing, maybe not all, and maybe not all in our case, but most of what he was doing seemed to be the nonjudicial developing of policies of collecting fines and fees, not the judicial function of imposing sentences or imposing fines. And we clearly say in our complaint, we are not suing Judge Hayes for his judicial decisions in the particular cases of our clients. Not all of our clients even appeared before him. In fact, you can't tell who people appeared before in the Montgomery Municipal Court because they don't keep any records or sign any orders, but that's, I probably shouldn't go there at this point. I do think that this case is distinguishable from Iqbal. In Iqbal, if you read it closely, what they really were concerned about is the difficult problem of plaintiffs trying to allege that a neutral policy is racially motivated under the Arlington Heights kinds of factors. It seemed to me that the concern of the Supreme Court was suing the Attorney General of the United States for having instituted what was alleged to have been an unconstitutional policy and making essentially conclusory allegations and being entitled, potentially, to subjecting the Attorney General to suit based on nothing but those conclusory allegations. And when I look at this complaint, it looks like there's a lot of that. And to suit against racially neutral policies that they allege were racially based. And in fact, Judge Lambert recognized the importance of looking at what the particular claims are in applying the Iqbal. He dismissed, and we disagree with it, but we can't raise that yet. He dismissed our claims that were similar to Iqbal claims. We had sued for racial profiling, and we argued that we had alleged enough to try to show the elements of the Arlington Heights to prove that racially neutral practices nevertheless were racially motivated. But we admit that's a very difficult proof. And so when you're applying Iqbal to that kind of analysis, Judge Lambert himself said he's entitled, the defendants sued on those counts were entitled to dismissal. And against the city as well, he threw out those counts. So we do think that, oh, I'm running out of time. Oh, you're okay. You're okay. I'll let your adversaries go over a little bit. See, I told you, the last day we're in a good mood. I thought you had been here every day. So, well, I'll give you 15 seconds to wrap it up. Okay. Okay. We just would point you as well, we haven't argued here today, but to the arguments that you do not even have interlocutory jurisdiction over either of these claims and reference you back to the case yesterday. We, you know, qualified immunity and absolute immunity are... But these aren't under 1983. None of our... Well, if you raise the defense of absolute immunity or qualified immunity, it doesn't matter to what claims you're raising those, we would have jurisdiction to entertain those, you know, those defenses. Those are immunity from suit defenses. Well, but we argue that this case is on all points with your decision in Truesdell that there is no qualified immunity in this statute. This is not 1983. This is Federal Penitent Statute. Oh, no. Truesdell... Ms. Morgan. No. I wrote Truesdell. Truesdell is about... Thank you. I agree with that. But it's about... That's about a municipal immunity from punitive damages, which was actually set out in the statute. That's different from official immunity of the kind that is at issue here today. Absolute judicial immunity and qualified immunity for a mayor and a police chief. But we have your case and we appreciate your... Please read again closely. Your opponents have a little rebuttal time. Mr. Harwood. Judge Martin, turning to the question you'd asked, the basis for which the state law says that each ticket has to have a separate case number is Rule 19 of the Rules of Judicial Administration. Oh, I thought you said there was a statute that required that. Well, I misspoke when I said statute. The Rules of Judicial Administration are promulgated by the Alabama Supreme Court and have the force of law. And this rule dealing with uniform traffic infractions shows, and it has with its forms going along with it, that each ticket has to have a separate case number and a separate file. Thank you. Turning to Iqbal, I think it's noteworthy that in Iqbal, this is a parallel case to it. You could just about change the names and have the same allegations. Reading from the Iqbal opinion, it states that... Iqbal is really a qualified immunity case, right? It was only a qualified immunity case, you're right. I mean, and you represent the judge, right? I represent the judge, yes. And that's an absolute immunity. And it appeared to me that this complaint alleges more about what it is that the judge actually does. But the issue is, as we were addressing earlier, is those all appear to me, at least, to be judicial acts. How does Iqbal really have anything to do with the judicial immunity issue? Not judicial immunity itself, but the plaintiff tried to plead around Twomby. Or maybe they didn't know about Twomby at the point. But at any rate, they tried to plead around by saying that Ashcroft, as the architect of this illegal policy, and I guess, ironically, Mr. Mueller, who was then the head of the FBI, that he implemented the same things they had charged against Judge Hayes, this policy that was illegal because it had improper motivation. And the court ruled that, wait a minute, you haven't pled enough just by saying they were involved in promulgating and initiating this policy and implementing it. Those are just legal conclusions. That's out. Thank you, Mr. Harwood. I think we have your case and we'll hear from Ms. Holliday. Thank you, sir. I want to make it clear, Judge Martin, how the, what the complaint says, if you read it closely, as to how this jail work program worked. The judges converted fines and costs two days. So there was a sentence that was given to these people. The jailer had a sentence of a number of days the person could work. The jailer was not in control of the number of days. But one of the allegations, I think, had to do with, you know, the record keeping at the jail was not accurate as to, you know, how many days somebody had worked. And that's in the complaint as well. That's in the complaint. And that's a complaint against the jailer for negligence. And that's a whole different lawsuit. That has no bearing on the police chiefs here. And wanted to focus also on the fact that Ms. Morgan said that there, we cited no cases that involved our situation in connection with a jail work program. And in fact, that is the reason that qualified immunity should be given to my folks. Not only is there no tie to them, factually speaking, but there's no clearly established law on the point. Section 1589 also has quite a lot of requirements before someone can be held liable for it. And it must be read narrowly. It is a criminal statute. It requires knowingly providing or obtaining the labor by means of, and I quote that, a force, threats of force, physical restraints. The jailer did not obtain the relief in that way. The sentence existed to the extent that anyone volunteered to do labor. They got a benefit. The jailer did not do anything that was forcing them to sit there. They didn't have to work. Ms. Holliday, you focus a lot on the jailer. But, I mean, really the client's the police chief, right? And it's even further removed from that, right? Exactly. I mean, you don't really have to win for the jailer today, do you? No. I want Judge Mark to understand what happened. She seems very concerned. And it was not as I think she understands it. Thank you, Your Honor. Thank you. So, we'll move to the last case. We have that case under submission. We'll move on to McCurdy v. Alabama Disability Determination Service. It's good to see you, Senator Sanders. It's good to see you, Judge. Well, he did a good job. His brother, his father was the Attorney General and a Justice of the Supreme Court. This is really awful. Does it make you miss Montgomery? No. No. I'd rather go to Miami and stay on South Beach. Thank you. Could someone please close the door for us? Thank you. McCurdy v. Alabama Disability Determination Service.